Mr. Goldstein. Mr. Chief Justice, may it please the Court. Our narrowest argument assumes that in circumstances like this case, Indian tribes do have the legislative jurisdiction to subject nonmembers to tribal tort law duties. Respondents argue that the same facts  the mandatory adjudicatory jurisdiction to decide private tort lawsuits against non-Indians. Respondents' theory is that when the tribes entered the United States and were incorporated into this country, their power to adjudicate cases in this fashion was understood to be an element of their sovereignty. That is not correct. I want to identify the three separate respects in which the overriding sovereignty of the United States and our Constitution. Ginsburg, please explain your opening statement. You say there is legislative authority, but not judicial authority. I don't know of any other instance in which a jurisdiction has authority to legislate, to regulate the conduct in question, but does not have authority to back up that legislative authority by adjudicatory authority. Can you give me an example? I can give you several, Justice Ginsburg. The first is removal. Remember, our point is not that the tribes lack any adjudicatory jurisdiction. It is that they lack mandatory adjudicatory jurisdiction so that we do not have access to a neutral judicial forum. A State has the power to pass State tort law, for example, but it does not have the sovereign authority to insist that the case be litigated in its own courts. It has the authority, but an out-of-State defendant can be moved to Federal court. But it has the adjudicatory authority. Justice Ginsburg, everyone agrees that the tribes have a form of adjudicatory authority upon consent. They don't have it inherently. The question is going to be what qualifies as consent. Our point is that in three separate respects, the national tradition of the United States and our Constitution does not contemplate that a sovereign would adjudicate cases in this fashion, and I want to briefly identify the three if I could. First, the Constitution contemplates the availability of a neutral forum for suits against noncitizens. And by analogy, noncitizens, as you say, Justice Ginsburg, have always been able to remove a case from State to Federal court. The United States at the time of incorporation could not have accepted that nonIndians would not be able to remove to a neutral forum. Second, the Constitution contemplates that this court will be the one supreme court, and State court rulings on questions of Federal law have, of course, always been reviewable in this court. Kennedy, this is an important part of the dialogue, but let me just go back to the first part of your response. Is it black-letter law given that tribes have complete legislative authority over non-tribe members for regulatory purposes? I take that as a black-letter law given? Justice Kennedy, if we say it in those terms, regulatory authority, without getting into the question of all forms of legislation, for example, tort law, then the first exception to Montana says that although there is a presumption against jurisdiction, the tribes do have their regulatory authority. We have the argument that tort law, because it is so broad and would swallow the rule that the tribes lack legislative authority over nonmembers, we have the argument that that is not within the legislative jurisdiction. What I had said at the beginning of the Court's review is that there is a presumption against jurisdiction. But doesn't that clash with what the Court said in Strait? I mean, Strait, let me read you the sentence. It said, It's an unremarkable proposition that where tribes possess authority to regulate the activity of nonmembers, civil jurisdiction over disputes arising out of such I need to just separate two questions. Justice Kennedy, I understood to be asking me, was do the tribes have the antecedent legislative authority? And I was explaining that we have the argument that in the tort context, they do not. You then point out that if the This was a tort case. So then I don't understand why you opened your, your, I, I, I, I thought you said We assume. I, I, I, you assume that this could be Well, I, I don't know why you make that assumption. I, I, I just I apologize. Can't get off of square one. Sure. I do not intend, Justice Kennedy, to give up a good argument in our favor. I was just attempting to identify the narrowest ground for reversal. I'm very pleased to discuss the threshold point, and that is that with respect to nonmembers, the tribes do not have the authority to subject us to such sweeping tort law duties. It's not that there aren't tort law duties. The plaintiff here is a citizen of the State of Mississippi. Mississippi's State tort law does apply to the case, and the plaintiff has a remedy in State court. Ginsburg. But would you then go back to my question about Strait, because if what you are arguing now is correct, Strait would have been a one-line decision, no tort jurisdiction over a non-Indian. Well, Justice Ginsburg, it's true that this Court's decisions can often be resolved in different ways. What Nevada v. Hicks in the footnote addressing this question explains is that what the Court has done is narrowly identify the legislative jurisdiction of the tribe in the cases before it. And so in Strait and in other cases it is held that the tribe lacked that antecedent legislative authority, and on that basis concluded, well, then, because the adjudicatory authority can't be broader than the legislative authority, there's no adjudicatory authority either. So the second point that I was going to make is that it's true that there is a legitimacy of the tribe. Was this wrong? Justice Ginsburg, what the Court has said in Nevada v. Hicks, addressing the various times that there is dictum in the Court's opinions that has assumed the parallel between legislative and adjudicatory jurisdiction, is that that question had not been fully considered by the Court and it remained open, and we assume that that's one of the reasons the Court granted review in this case, to decide, assuming that there is legislative jurisdiction, whether there also is adjudicatory jurisdiction. And I'm pleased to explain why it is, and what my introduction was trying to do, was assuming the antecedent legislative jurisdiction. Here's why you don't have jurisdiction to decide a court case in this fashion. So the first one that I gave you was the availability of a neutral forum as anticipated by the Constitution. Sotomayor, can I address that a moment? States appoint judges. Sometimes they're elected, but often they're appointed.  Sotomayor, we think of it as neutral because the judges are neutral. You're just assuming that these judges are not neutral. Oh, Justice Sotomayor, I think actually that your hypothetical is a good one for us. In Article III of the Constitution, we contemplate the availability of a neutral forum when a noncitizen is a defendant in the case, including when we, you know, ordinarily respect the neutrality of State court judges, right? If a noncitizen is sued in State court, like we are a noncitizen of the tribe, is sued in the tribe. But that's out of comedy or our sense of comedy between the States. But it doesn't have anything to do with the fairness of a judicial forum. I just simply disagree, Your Honor. My understanding of the premise of removal jurisdiction is that there was a concern or at least a belief that respect for rule of law is enhanced by the availability of a neutral forum. But I did want to say that I think that's a good point. What's wrong with tribal courts? What's wrong with the tribal courts? It depends. First of all, let me say that there are modern tribal judiciaries like this one that deserve genuine respect, that are — have developed real principles in an attempt to identify law that can be known ex ante and the availability of a neutral forum. There are, however, many tribes, everyone agrees, that don't have anything like that. They instead deserve respect in a judicial forum. Breyer. So we've seen lots of tribal courts, which I can't distinguish them in the fairness and procedure and so forth from every other court in the country, and maybe there's some where that isn't true. So what you do is you go and complain, we didn't get due process of law, if you're in one of the ones that has some unusual thing about it. But if you're in a normal thing, you say it's normal. So what's wrong with saying just that, like a State court, which has terrible procedures, terribly unfair, or a foreign court? You complain you didn't get proper process. But that has nothing to do with this case, or little. Scalia, you can remove from State court, can't you? Yes, that's right. And when removal is asked for, we don't ask the question, what's the matter with State courts, do we? That's right. Our Constitution. We just say that the Constitution says you have a choice of having your case adjudicated in a Federal court. Justice Breyer, I'm not going to lose sight of your question, but just on this point, our Constitution says we anticipate a neutral forum, that this Court will be the supreme judge. But the Constitution, the removal statute is a statute, it's not constitutional. Justice Ginsburg, I understand that. And, Justice Breyer, I'm not losing sight of your question. What Oliphant and other precedents of this Court say is that the tribes have the sovereign authority that is consistent with the overriding sovereignty of the United States. And the point I was trying to make is that our legal tradition understands that there will be certain basic protections. And remember, two of the things I'm identifying in the Constitution are not specific to the States, the supremacy of the Constitution, but the Constitution does not apply in tribal courts, and also the supremacy of this Court as the one supreme court which is not available. Now, Justice Scalia, those are features of our national legal tradition, and those features existed at the time of incorporation of the tribes into the United States. And my point is that Congress could not have believed that if State courts couldn't do these things, that the tribal courts would be superior. Now, Justice Breyer, you said, well, what's wrong? Two things. I want to say that there are some things wrong, even in the context of a tribe like this one. For example, we have a Federal claim against the due process — excuse me, a due process claim against the putative damage reward that's asked for in this case. And that would be entirely unreviewable in this case. Now, you contemplate the prospect that we would collaterally attack the judgment. A few things about that. The first is, if that's going to be serious, if we are really going to have a serious regime of collateral attacks where you would just assess whether or not the tribal court ruling is consistent with due process, that is hardly treating the tribal courts as sovereigns. Imagine a Federal district court ruling could be overturned by a circuit court in Mississippi. We wouldn't say that that was an actual sovereign ruling. And the second is that that review system is extremely rare. The Respondents identify a single case, one Ninth Circuit case, in which a tribal ruling was overturned. What the Federal courts have done is afford enormous respect and only overturned rulings of tribal courts or foreign courts that are way out of bounds. My point is that the rule that's contemplated by the Constitution is not one of being way out of bounds. It is simply that we have a right to due process, that this court will be the supreme court, that the Constitution is the supreme law of the land. And when that is not true in the courts that we are talking about, even the best managed, most modern courts, when those rules simply don't apply, that is not consistent with the Constitution. Ginsburg. But doesn't the Indian Civil Rights Act, I mean, it's not the Bill of Rights, but the Indian Civil Rights Act is pretty close? Well, Justice Ginsburg, the rule of the Constitution is not close is good enough, but I will say that I think the Indian Civil Rights Act is a point in our favor. Because when you talk about the regulatory matters discussed in the First Montana exception, like taxation and licensing, those are things that Congress has left to the tribes. But the Indian Civil Rights Act, like Public Law 280, like the courts of Indian offenses, like the Indian Depredation System, shows that the United States has actually been deeply involved in the tribal judiciary. It has not treated tribal adjudication of civil claims as something that belongs to the tribes. It's quite different. The United States obviously did not regard the tribes' judiciary as something that is purely a part of their government, because time and again it has micromanaged them. And, Justice Breyer, I do want to point out another example of that, and that is the Violence Against Women Act. There we see the right way of doing this, and that Congress has developed systems that say if this tribal judiciary is a good one which affords due process, then it has jurisdiction over cases. And we think that's the right approach here. Congress has the institutional capacity to develop rules like the one you were talking about. It's a much more set up system. Breyer, and there are books, some of which I have at least looked through, and certainly articles, that suggest that the tribal courts function perfectly well, certainly in many places. Now, I take it your argument is that there are some places they don't function well, and in respect to matters that are not matters of Federal law, there won't be review from those courts unless you collaterally attack them. Is that your point? Justice Breyer, as I mentioned, we have real concerns even with respect to a system like this one. For just an example. I just want to know if I got your point right. No, our point is broader. You had suggested, Justice Breyer, that I was concerned about another set of tribal judiciaries. I just don't want to lose sight of the fact that there are concerns even when you have the most modern tribal judiciary. An example is that we are a noncitizen, a nonmember of the tribe, and the tribal jury may be composed only of members of the tribe, and there is no inherent rule that stops the jury members from being people who know the plaintiff. Now, with respect to other judiciaries, it is the case that we do recognize and the United States has recognized a wide swath of tribes that use more traditional dispute resolution mechanisms that also deserve respect, because that's the tribal tradition. But it is not the tradition of due process. And the question you've got to figure out is whether or not that's the case. Breyer, a non-tribal member goes to the tribal land and signs an agreement that says tribal law would apply, and then commits a tort on the tribal land, even under those circumstances, and even if the court is functioning well, the tribal court cannot take jurisdiction over his claim. That's your position. And then to that I say, if I haven't got it already, why not? Okay. Justice Breyer, I do think your hypothetical of a contract is a really good one for us, because we do believe that the Respondents are most concerned, and their best facts are a business like this one, to be honest, that's operating on tribal land in the reservation on an ongoing basis, and they say, look, you have to have anticipated the applicability of tribal tort law. We disagree, but we understand the argument. My point is that in these circumstances, what the tribes do is, as a condition of operating on the reservation, they call for not just what you described, which is the application of tribal law, but a consent to the forum. And remember, in this case, there is a consent to the forum, but the tribe — which the tribe wrote, but they limited it to disputes arising from the lease. So we say going forward, we have two solutions. One I've described, that's the prospect of congressional action. You say it could work the other way, and I'll come back to that. But the second is just the contract. Obviously, in the cases that they're concerned about, what the tribe can do and will do is require, as a condition of coming onto the reservation, that you accede knowingly and actually to the jurisdiction of the tribal courts. And the contract can go either way. The question is what's the default rule when the contract doesn't say anything? Actually, it wouldn't work the other way, Justice Kagan, with all due respect. Remember, this is a private tort suit by a member of the tribe. Kagan. No, but remember that this is an exception for consent. The company would have, the store would have an extremely good argument that it didn't consent if it had signed a contract with anybody, with the tribe, not just with the individual person. If it had signed a contract with the tribe saying, we insist on a State forum, they clearly haven't consented. Well, Justice Kagan, I just don't understand how it is the case. I disagree. Let me just explain why, understanding that you have the opposite view. If a private person sues us, the fact that we have a contract with that individual State government does not strip a State court of jurisdiction over their private suit. So that's our view of it. But I just don't understand. Well, it does when the Montana exception relies upon a consensual relationship. But, Justice Kagan, for the other side to win, what they have, their premise is that the consensual relationship exists in simply the activity with the individual tribal member, not the contract. Remember, their point is that a contract is irrelevant. So the consent would exist simply by operating the business. But in all events, it is the case that we could insist on a contract, they could insist on a contract. My point to Justice Breyer was simply that the upshot of our position still leaves enormous room for the exercise of tribal sovereignty. They do have this power. Remember that the data before you from the United States indicates that this is a very small proportion of cases that the tribal courts adjudicate. The data from this tribe indicates that it's 1 percent of cases. All of these arguments, your arguments, let me figure out whether this is right. Your arguments about it's a non-neutral forum, it's an unfair forum, we don't know whether they have the same procedures that are commonly, that commonly exist in Federal and State courts. Those arguments have nothing to do with tort claims versus other claims. Is that right? They do have a lot to do with the fact that it's a private claim. Let me distinguish, importantly, actions by the tribe itself. And the analogy here is that when a State sues a non-citizen, that is an act of the sovereign and it is not removable. Because what Montana is concerned with, what this Court's precedents are concerned with, is the exercise of sovereign authority in the pursuit of self-governance. This is not a sovereign action. This is a private suit between two individuals. And so it is important that if the tribe is exercising its sovereign authority, bringing a civil enforcement action against us, for example, that would present a very different question, because it would be sovereignty. It has never been understood that a tribe brought this suit instead of the parents of the boy who was molested, if it could, then it would be okay? Well, we think that's an impossibility. Remember that the other side's explanation, although there aren't any citations, it's hard to know what the tort law is. The other side's explanation is that tort law of the tribe tracks Mississippi tort law, and there isn't a situation in which the tribe could bring such an action. And I think if it was a parents' patria action, we would still regard it as in the interest of the individual. I'm thinking instead, Justice Ginsburg, of take the follow-on to what Montana describes, that is, a licensing regulation or a taxation regulation. We believe that if the tribe went into tribal court to enforce those measures, that would be a sovereign action and it would be susceptible of the Montana exception. The difference is, when the tribe is not a party here, we don't deny that there is some sovereign interest, okay? There is some sovereign interest in this adjudication. It's a bit of an odd argument, isn't it, Mr. Goldstein, that there's less of a sovereign interest in protecting your own citizens than in enforcing your licensing laws? Goldstein, if that were our argument, it would be an odd one. What we say is that you have a very different regime. If you had a legal regime that said, here is a duty towards our noncitizen or our tribal members, or just individuals on the reservation, and if you violate that, here are a set of fines, you will be excluded from the reservation, then that would be an act of the sovereign. So our point isn't just it's the nature of this. You know, this is a very serious allegation that we take very seriously about a minor child, a member of the tribe. I am not demeaning that in any way and saying, well, that's less important than taxation or a hunting license. Not at all. My point is that you are being asked that at the time the tribes came into the United States was a private suit against a nonmember regarded as an incident of sovereignty. Could the Congress of the United States, when the States didn't have this authority, when the Constitution didn't contemplate they would, have really believed that the tribes could? Kennedy, your brief consistently, let me say suggests, that Congress could authorize this jurisdiction. Could Congress pass a law saying that all 500-plus Indian tribes in the United States have unlimited criminal authority, could impose life sentences on non-tribal members, American citizens? We think not, and let me explain the reason. That would be State action. You know, the Federal Government would be passing a law essentially shunting the jurisdiction over an individual's matter into another adjudicative system. Well, why can they do that? If there is a limit on that, why isn't there a limit on what Congress could do with reference to tort law? That you get unlimited power. 500 tribes have unlimited power to impose punitive damages for civil torts. If it happens within the boundaries of the reservation. Justice Kennedy, if I have suggested that Congress could do that, I apologize. It wasn't my intention. My question is what are the limits? The limits are due process, and that is that if you're — and the reason that due process applies here is that the tribes' judgment — we've switched to the civil context now in your newest hypothetical — if the tribes' judgment would presumably be enforceable in the courts of the United States or of a State, there would be State action then, and it would violate the principle of due process. It also would be— Kennedy, my hypothetical is that Congress gives Indian powers, Indian tribes complete powers, both civil and criminal, over all persons on tribal reservation. No Federal review, nothing. That's unconstitutional because Congress is subject to the Constitution. It would violate the Supremacy Clause. It would violate Article III, which contemplates— Then why doesn't — why don't you make that argument here? How can they — how can they allow a tort suit? Justice Kennedy, we agree with you that there's a certain— We could say the Montana first exception, we could— Let's say the Montana first exception doesn't apply to this case. We do — okay. Justice Kennedy, we do make the argument you're describing. I apologize, I misunderstood your point. It's my fault. We say that there is a significant constitutional avoidance argument, that's how we describe it, in concluding to — for concluding that Montana does not apply here. Because of the very serious prospect that there would be a loss of property without due process of law, because the tribes would have just what you've described, this plaintiff has sued us for multiple millions of dollars in punitive damages. We do not have the guarantees provided by the Constitution, and we do not have review in this Court. Well, if the — could the Congress of the United States give the U.N. authority over our citizens? I agree. But if the U.N. authority is not a constitutional entity, then why would we have the right to do due process? They're not a constitutional entity. That's the second point I made, Justice Kennedy. We have the procedural due process question, but also the Article III question, and that is, this is the Supreme Court of the land. The Supremacy Clause says that the Constitution will be the supreme law throughout the land, and Congress could not take cases in the United States and assign them to the U.N. or the AAA or anybody else. We absolutely agree with that. Ginsburg. But what civil cases can be brought? Let's assume that the incident occurs on the reservation, and the wrongdoer is not a member of the tribe. What civil claims can be brought against nonmembers in tribal court? The following. The first is, and this case is an illustration of it, those claims that are subject to the contract that allowed the individual or the business to come onto the reservation we acceded quite expressly to jurisdiction over disputes arising from the lease. The second is, when the tribe itself, in the exercise of its sovereign authority, brings the action so long as it's consistent with principles of due process. We think that would be much more consistent with monitoring. For example, what would fit into that category? The examples that I gave before are that enforcing a taxation rule, enforcing a licensing rule, also, importantly, the tribe has the self-help remedy of exclusion from the reservation, if I could reserve the balance of my time. Thank you, counsel. Mr. Katyal. Thank you, Mr. Chief Justice, and may it please the Court. The facts of this tragic case place it squarely in the heartland of the sovereign tribal jurisdiction that this Court has recognized for decades. Dollar General set up shop on tribally owned land with a lease and license from a tribe and agreed to participate in a tribal internship program. Then the tribe placed a Choctaw child at the store and paid his wages. In the course of that consented-to employment of that child in that store on that tribal land, Dollar General's manager allegedly assaulted him. You say this is in the heartland. We have never before recognized Indian court tort jurisdiction over a nonmember, have we? Well, I think that you haven't applied the rule, but as Justice Ginsburg was saying, this Court unanimously and straight said that when tribes possess authority to regulate activities of nonmember, civil jurisdiction over disputes. Right, right. But I guess I want to make sure I understand what's at issue here. There has never been a case in which a nonmember has been hailed into Indian tribal court on the basis of tort, has there? Well, I think that there have been many cases, Your Honor. Four of them have come before this Court in which they have been hailed before. So straight is an example, Iowa mutual is an example. And held liable in tort? So this Court decided those questions on antecedent grounds. So I guess I don't know that we need to find — there has never been a case where a nonmember has been held liable in tort in an Indian court. Mr. Chief Justice, that's exactly right in terms of describing — I think it's a little odd to say this is in the heartland of Indian jurisdiction. Well, I don't think it's odd at all. That's the rule that this Court laid down. That's the language in straight. And, my friend, Mr. Goldstein's best argument on the other side is your language in — this Court's language in Hicks. Dictum is dictum. Dictum doesn't make something heartland. Well, I think that — Cases make it. Judgments make it heartland. Justice Scalia, I think everything about this Court's precedence in this area, which are all tort cases, leads to that conclusion. Mr. Goldstein's best argument is Hicks, but remember in Hicks, the Court went out of its way to say that the claims in El Paso, which were very similar to the claims here, it was a nonmember business doing business on tribal land, it was a tort lawsuit. What did this Court say, citing to footnote 4 of El Paso? There's little doubt there was jurisdiction in that case. So, yes, I understand that they are dicta, but it is dicta of the most persuasive sort. It is the unbroken rule of this Court, frankly, that in all of these cases, this Court has said there was presumptively jurisdiction. And, indeed, the exhaustion cases would make no sense otherwise, because twice this Court said in tort cases, in Iowa Mutual and National Farmers Union, this Court said you've got to go to tribal court and exhaust your remedies. And, Justice Scalia, if the rule in those cases was, hey, tribal courts don't have jurisdiction, they would have done what you did in your opinion in Hicks, because at page 369, you said, quote, "'Since it's clear tribal courts lack jurisdiction over State officials, adherence to the tribal exhaustion requirement would serve no purpose.'" That's the most ---- Alitoso, does your argument apply whenever a nonmember enters into a commercial transaction with a member? No, it doesn't apply. On tribal land? Well, on tribal land, we do think we don't think you have to go as far as the Solicitor General to say it's absolutely 100 percent dispositive, but we do think this Court has recognized in Marion and El Paso that when you're on tribal land, the tribe's powers are at their zenith. Well, I'm trying to understand the limits of your argument. So what would happen in this situation? A tribe ---- a member of the tribe purchases a product online from a nonmember company, and the product is delivered to the tribal member on tribal land. The delivery person gets involved in a traffic accident or some other dispute in the course of delivering the product, and the product itself injures the person who purchased it. So could the person who got into the ---- who was in the accident with the delivery person sue in tribal courts? Could the person who ---- the tribal member who purchased the product bring a products liability action against the manufacturer in tribal court? It depends a little bit more on the facts. So in general, what this Court has said is that you need a consensual relationship with someone on the tri ---- on tribal land. And so, you know, to the extent that that delivery service was operated by, you know, by the nonmember and that they're actually doing the delivery, absolutely there's a nexus between the delivery and the injury. Now, if it was some exotic tort, so for example, it's the delivery truck comes onto tribal land, and unbeknownst to them, there's some, you know, unusual tradition that says delivery trucks have to be painted, you know, some other color or something like that that they don't know about, I think this Court's decision in Plains Commerce Bank says that's not what you're reasonably anticipating. So this is a very limited rule, really tailored to circumstances like this in which every ---- the law of every jurisdiction would be ---- Kennedy, what about the products liability action? So again, if a business is sending intentionally and knowingly, sending goods onto tribal land, and those turn out to be defective, then they're liable for that, for that tort. That is something that's reasonably to be anticipated. And that could be for punitive damages, millions of dollars? If that's what they have consented to. So for, you know ---- No, no, there's no consent. It's just what Justice Alito said. They send their products to 50 different States and all of the tribes. If they do so knowingly, and there is that kind of long-term relationship, then yes, unless they themselves disclaim that. And of course, it's very easy, as Justice Kagan was doing ---- Well, number one, that's not explicit consent. We can get into that later. Well, I certainly ---- So punitive damages, millions of dollars. Right. As long as they haven't affirmatively disclaimed it. And I think that is, Justice Kennedy, the proper rule. But, Ken, what about limiting? I'm sorry, Justice Kennedy. Now, what authority Congress has to subject citizens of the United States to that non-constitutional form? It's exactly what this Court, and, Justice Kennedy, you join this in Plains Commerce Bank, because what this Court said is that, yes, there are these constitutional concerns that tribes are, you know, tribes are outside the constitutional system and so on. But when someone consents through their words or their actions, not express consent, then that takes it out of that circumstance. And so Dollar General had a remedy available to it right away. It didn't have to be forced. Nobody forced Dollar General to show up on the tribal lands. Nobody forced Dollar General to sell to these customers. Nobody forced Dollar General to have this youth opportunity program. And, yes, like every employer in this country, Justice Kennedy, when you do those things, you open yourselves up to the reasonable liability that follows. Alito, let me give you another hypothetical. Someone goes to an Indian casino and loses a lot of money, and then when the person goes home, the person goes online and says, they cheated me, the game was rigged, the blackjack dealer was doing something, and they – and so then the – could the tribe sue that person for defamation in tribal court? Well, I think – I think that that's not something that would be permissible under this Court's Atkinson Trading Nexus test. I think it's got to be something that's got to be reasonably anticipated, and I'm not really sure that that kind of thing is. All we're saying here is that this is a circumstance in which, as the Solicitor General's brief at page 32 says, the law of every jurisdiction treats this kind of thing as something that is a reasonably anticipatory thing when someone's running a shop – when someone's running a store and having a youth opportunity program. Yes, there are more economies. Ginsburg. How do you deal with – I think his strong point on the other side is the absence of removal. Yes, that's – that I do think is something that, you know, that my friend on the other side has said. Of course, as you were saying, Justice Ginsburg, removal is not constitutionally compelled. So it would require a statute. Here, the removal statute requires diversity, full diversity between the parties, and $75,000 is the limit. And I don't think that we would say anything that doesn't fall within that is somehow not an incident of sovereignty. And I also would point to this Court's language in Iowa Mutual about the diversity statute, because what this Court said with respect to the diversity statute is, you know, it does require a statute. That statute doesn't really tell us anything one way or the other about tribal jurisdiction. And what this Court went on to say is that civil tribal tort jurisdiction is an incident to sovereignty. It's Williams v. Lee. It's about the right of the people to govern themselves. And, you know, to treat this, Justice Kennedy, like express consent is to treat a tribe the way you're treating the American Arbitration Association or JAMS, and that has never been what this Court has said. When you're dealing with the Montana 1 exception, which is a limited exception, it requires really, you know, it requires a true relationship and open and honest consent of the kind that existed here in which they knew they were coming onto tribal lands and subjecting themselves to tribal law. Roberts. Roberts. Why was the contractual provision, acquiescence in the application of tribal law, limited in the way that it was if they were in fact subjecting themselves to tribal jurisdiction across the board? I don't think it was limited at all. This is the language at Joint Appendix page 45. This agreement and any related documents shall be construed — excuse me, the dollar general shall comply with all codes and requirements of all tribal and Federal laws and regulations now in force or which may hereafter be in force, which are applicable and pertain to dollar general-specific use of the demise premises. That is not limited language. Is there any reason that the issue that we're arguing about couldn't be dealt with through particular contractual provisions, as they are in some cases where you either subject yourselves to the jurisdiction of the tribal court or not? Sure. I think that they could on either side. I think that's possible. But I think what this Court has said time and again is that that is not necessary. Your language, Mr. Chief Justice, in Plains Commerce Bank is that you can consent by your words or your actions. This Court's earlier language in the path-marking Montana case is not that it requires express consent, but rather through commercial dealing, contracts, leases, or other arrangements. For you to go further than that and adopt my friend's argument is to radically depart from that path-marking decision and change the rules and put tribes on no greater a footing than the American Arbitration Association. So what would do we have to reach in this case? The question of products liability or products sent into the tribal area. I would have thought you could say this does not involve that. If you're willing to read, and I don't know if you are, nonmembers who enter into this kind of explicit consensual relationship, growing out in relation to a contract to which relationship the tort is directly related. Exactly. Is there any other? And what is the word in Cherokee, I forget, it's something dependent nation. What kind of dependent? There are two words. Domestic dependent. Domestic. All right. So if, in fact, Tasmania had this kind of situation, and an American went to Tasmania and got a reasonable judgment, I take it our courts would enforce that? Correct. And of course you're going to agree with this. But if I wanted, I wanted the limitation, and I wanted to know if you wanted me to read one thing that you have cited in respect to what is only impressionistic, that the vast number of tribal courts are indistinguishable in terms of fairness, et cetera, from the courts of other courts in the United States, what would I read? Well, I think, you know, we've cited to a, you know, some lawyer. Which of those do you want me to read? Well, I think that maybe Justice O'Connor's article is a good place to start. And so I think what I would say there, Justice Breyer, is that fairness concerns have never been relevant to the jurisdictional inquiry. I think that's what this Court's decision in Iowa Mutual said. With respect to your products-like liability hypothetical, we think there are four limits on the rule we have, which is why, you know, look, this has been going on for a long time, tribal court jurisdiction. Congress hasn't seen fit to modify it, you know, if they were concerned about the concerns Justice Kennedy had. And the reason is because this is a limited thing. It requires a very tight nexus. That's, you know, this Court's decisions in Plain Commerce Bank and Atkinson's trading. It requires knowledge. It's got to be you've got to know what you're doing. You can't just wander on to the reservation the way the Oklahoma brief did. Roberts, if we're going to evaluate the due process concerns on a case-by-case basis, as a general matter, does it violate due process for a nonmember to be subjected to a jury verdict where the jury consists solely of tribal members? Well, first of all, you know, that's not necessarily what's going on here. There's no jury trial on this case. Roberts, it's kind of a yes-or-no question. Does it violate due process as a general matter for a nonmember to be subjected to a jury trial where the jury composed solely of members of the tribe? I could see it violating ICRA. It wouldn't violate formally the Constitution. It would violate, you know, the due process. It arguably could violate the due process clauses incorporated into ICRA. That would be something we're talking about. That's because tribes are not governed by the due process clause. Yes, but they are governed because they're nonconstitutional entities. Correct. But Congress has brought the due process clause to tribes in the form of ICRA. And of course, Justice Kennedy, if they were more concerned and said, look, we don't even like the way tribes, you're interpreting ICRA or something like that, tribal courts, they could go further. They could do all of it. They could ban those juries. They have plenary jurisdiction in this area. That's why the ballgame is in Congress's court – Congress's shoes. It's not in this Court's. Is it right? I'm thinking that there are $50,000 at stake in many cases. And many citizens of New York who want to feel – sue citizens of Massachusetts do have to go before juries to obtain the $50,000 in a Massachusetts court and suppose the plaintiff is a Yankee fan. That's absolutely right. That's absolutely right. And so in that – So you think the concerns are on the same level, forcing somebody in a State court to be subjected, a New Yorker to be subject to jurisdiction where everyone is from Massachusetts because it's a Massachusetts court. You think that's the same as subjecting a nonmember accused of a terrible assault on an Indian to jurisdiction before a jury consisting solely of members of the tribe? I don't think it's the same, Mr. Chief Justice, but I think there are two things which make them similar. One is that they themselves, that nonmember, is consenting to that by going to, like the store here, setting up shop and running the Tribal Opportunities Program and serving its members. And number two, the big difference is that Congress has full control over there. If they are concerned about all Tribal member juries or something like that, they can regulate those. Civil jurisdiction and Tribal courts have been going on for decades, and we haven't seen Congress doing that. And indeed, much – you know, very interesting, here you've got the sovereigns of every relevant entity. You've got the United States as well as the State of Mississippi itself saying we're not concerned about those things. Actually, this is an incident of – Kennedy. The Constitution runs for the people. The people have a right to insist on the Constitution, even if Mississippi or the Federal government doesn't care. I completely agree with that, Justice Kennedy. My only point is to say that here Dollar General has themselves, by opening – they have the keys to avoiding this by not showing up at the renovations. No. This gets into implied consent, expressed consent. You know all the hypotheticals. You consent to have your luggage searched. You go through their, say, I don't consent, I don't consent. It's implied. Everybody knows that. But this is quite – it seems to me that the first exception in Montana is quite different. It talks about contracts. And the tribe could certainly have put this in a contract if they wanted, just like an arbitration clause. Well, Justice Kennedy, we do think – the argument doesn't depend on it, but we do think that they did put it in the contract. That's the language that I was just reading to the Chief Justice. But just to be clear, the language of Montana 1 is broader than what you're saying. It is, again, through commercial dealing, contracts, leases, or other arrangements. And my friend, Mr. Goldstein, clever as he may be, doesn't have an argument that this isn't commercial dealing. This is. This is, you know, as good as – this is – this is the heart – as I was saying, this is the heartland of what Montana 1 is about. This is a circumstance in which a tribe is entering into a long – a store is entering into a long-term relationship, and any business in America doing this, whether they set up shop in France or in the city of San Francisco, knows they're opening themselves up to the local regulation that may follow. If there were a forum selection clause in this contract selecting State court, would that bind tribe members? I do think it would. And so on what theory? I think that the tribe itself has the ability to, just as they can decide to use the American Arbitration Association or whatever, they can buy into some other area of law. I don't think that my friend, Mr. Goldstein, is disagreeing. He said sometimes it's hard to do in response to Justice Kagan. I don't think it's hard to do at all, because the whole question is are you reasonably anticipating a certain amount of jurisdiction, and you are. And of course, there's other solutions, indemnity provisions. If you're worried about the due process, lack of due process, you can have indemnity arrangements, as many leases do, including Dollar General's current lease. There's lots of different ways to deal with this concern about, you know, lack of constitutional concerns. But this Court – Ginsburg. These plaintiffs want to bring the case in tribal court, where they can get, on your argument, they can get Dollar General, but they can't get Townsend. If they sued in State court, they could sue both defendants. So because going after Dollar General effectively does provide them all the remedy they need. That's why they never appealed that piece of it. And, you know, and the other thing is, this is really important as a matter of tribal sovereignty. That is, Williams v. Lee says it's about the right of the people to govern themselves. The domestic violence brief gives other reasons why, in general, people want to bring suits in tribal courts, because it's a more familiar process and one closer geographically to them. Many times, State courthouses are hours and hours away. So that's another reason. But at the bottom line here is, this Court said in Williams v. Lee, this is about the right of the people to govern themselves. I appreciate the constitutional concerns, but Plains Commerce Bank baked those into its consent rule. It said, yes, there are those constitutional concerns. They would apply to some wandering entity or something like that, but not to someone who consents either through their words or their actions. Kennedy. Kennedy. Just so you know, it seems to be a reading of the first Montana exception, which is what we're talking about here. It talks about taxation, licensing, and then it talks about consensual relationships. And we have this whole question, is it explicit or is it implied? And then it talks about commercial dealing, contracts, leases, or other arrangements. That doesn't sound like torts to me. And it seems to me that, since that's a reservation of mine, you might want to address it. Sure. So I think this Court in Regal already said that torts are a form of regulation. I think there's no reason to think of torts any differently because they impact bodies of behavior and precedent. Stare decisis, you've said this many times in the cases I've mentioned. Thank you, counsel. Mr. Kneedler.  I'd like at the outset to respond to the argument that tribal court jurisdiction over tort claims is somehow inconsistent with the superior sovereignty of the United States. That argument was flatly rejected, I think, in both National Farmers Union and Iowa Mutual, where this Court was asked to apply the rule of Oliphant to civil jurisdiction. And this Court, in a unanimous decision joined by Justice Rehnquist, who is the author of Oliphant, said that those principles do not apply to civil jurisdiction. Iowa Mutual and National Farmers Union enforced the rule of exhaustion on that premise. Then, importantly, not too long after that, Congress undertook a thorough review of tribal courts in connection with the passage in 1993, as we explain in our brief, of the Tribal Justice Improvements Act, Tribal Justice Act. It held hearings, and in that statute, Congress made two specific findings. Tribal justice systems are an essential part of tribal government and serve important forms for ensuring public health and safety and political integrity of the tribe. Congress in Federal courts — Nobody denies that here. Well, no, but if I could — It is essential for disputes between tribal members. No, if I could finish. What Congress's — Congress's judgment, the next finding, Congress in Federal courts have repeatedly recognized tribal justice systems as the appropriate forms for the adjudication of disputes affecting personal and property rights. The committee reports on that statute make clear that they — that those provisions were enacted in light of Iowa Mutual and National Farmers Union. And in fact, one of the — one of the committee reports says that that second provision was added in recognition of the jurisdiction that tribal courts have over non-Indians. That would be impressive if it said personal and property rights of non-tribal members or against non-tribal members. It makes no reference to that at all. No. The — what I'm saying, it was enacted in the wake of National Farmers Union and Iowa Mutual, which both concerned tort claims against non-Indians, and the legislative history makes clear that Congress was implementing that, and it provided funding for tribal courts. Another point that it's — Scalia, you think everybody who voted for that statute was aware of that, right? They were aware of those cases, I'm sure. There were — Who voted for that language were aware that it — it stemmed from those cases, because that's what the committee reports say. This — this was a statute against the backdrop of two decisions of this Court saying that the rule of Oliphant does not apply to civil jurisdiction over non-Indians in tort cases specifically. And importantly also in Iowa Mutual, the argument was made about — specifically in connection with the diversity point, which Mr. Katyal has responded to, but the argument that the policies of the diversity statute, such as concerns about perhaps competence of tribal courts or bias, that they should at least inform the analysis of tribal courts. And the Court said that would be inconsistent — and this is before the 1993 statute — that would be inconsistent with Congress's judgment about encouraging tribal courts as an important expression of tribal sovereignty. And then Congress comes along and provides funding and training statutes that — that provide for training of tribal judges, money to support the payment of tribal judges in — to support tribes in publication of their tribal codes. Congress thoroughly examined this, and then again in the year 2000 enacted a statute with a similar finding. So what we have here is not congressional silence, but congressional approval of that here in particular. Sotomayor, I don't know that you've answered. I'm going to assume everything you said and accept it. I think it was very clear from the committee report here, every word you've said. And some of us do believe that since a bill is sent with the committee report and Congress is voting on both, if a member hasn't read it, they've abused their official responsibility. Scalia, Congress vote on the committee report, Mr. Kneedler? Kneedler, sometimes. Scalia, it does not. It does not. Breyer, they vote on the committee report in any instance where there's a reconciliation between the two houses because it comes back in the form of a vote. Do you accept the report of the joint committee? Kneedler, which is not here. Kneedler, did they vote on the committee reports here? Kneedler, my point is that this was a puncher point. Breyer, I'm sorry. Did they vote on the committee reports here? Kneedler, no, they did not vote here. Breyer, if we're getting into this, I'm sort of interested, because I bet it could be true that the President of IBM, for example, does not himself read everything that the entire million-man staff or million-person staff at IBM, in fact, prepares for the public. So if you want to answer questions like that, go ahead. But if you don't want to answer them, forget it. Scalia, he's an executive, isn't he? Isn't the chairman of IBM an executive? And executives can delegate authority. They can tell a committee to do it in his name. A legislature cannot do that, can it? I think Justice Sotomayor had a question on the floor. Sotomayor, we've gotten off on a sidetrack. Mr. Kneedler, some of my colleagues have been expressing a question that I'm sure you haven't answered, which is how can or how does the Constitution, particularly Article III, which gives every citizen the right to have their claims adjudicated before an Article III court, how does Congress have the power to let to place adjudicatory powers over a nonmember, non-tribe member in a tribal court? Kneedler, the answer is Congress has not placed it as part of the inherent sovereignty of a tribe that predates the Constitution and was not displaced, as this Court made quite clear in the National Farmers Union decision. Unlike in criminal cases, where from the start, from 1790, and this was an important part of the Court's analysis in Oliphant, from the very beginning, Congress placed criminal jurisdiction over crimes by non-Indians against Indians in Federal courts in order to assure that they would have the full protection of the due process clause in courts. Congress has never done that with respect to civil jurisdiction. And the other one was that it's not right that everybody has the right to an Article III tribunal. Kneedler, no, that was going to be my second point. State courts over issues of State law do not have authority or do not have the ability to go to Federal court, and the same thing with respect to tribal law. Scalia, but out-of-Staters do, at least where there's an adequate amount in controversy. Kneedler, the Constitution does not require that. It provides for it, but it does not require it. There's an amount in controversy requirement and also a complete diversity requirement. And if Dollar General was a Mississippi corporation, there would be no ability to remove it. Roberts, is it consistent with your concept of due process as a general matter to have a nonmember tried by a jury consisting solely of tribal members? Kneedler, I think there's a very strong argument that it is, because the tribal members are the citizens of the jurisdiction whose courts are being held. Just like when someone goes from Alabama to Mississippi, they may be tried before a jury of Mississippians who are not of which that plaintiff is not a member. But if there is a problem with that, that is why the Indian Civil Rights Act is there. If that is a due process problem, that is something that can be raised. And, Justice Kennedy, in response to your concern, Congress has fulfilled its obligation with respect to the jurisdiction of tribal courts over nonmembers by the Indian Civil Rights Act to assure that the protections that are equivalent to the due process clause are afforded people. There may be some very — Could it do the same thing with the American Arbitration Association? No, it could not. But tribes have inherent sovereignty. The American Arbitration Association does not. The last thing I wanted to point out is — Kennedy, but I do think on your earlier point, there was not a general practice before, say, 1900 at least of trying non-tribal members before Indian civil tribal courts. Or is that incorrect? No, there was some with the five tribes in Oklahoma, but tribes did not have developed judicial systems. But that does not mean that they weren't resolving disputes in some manner, however it may be. They have now given expression to dispute resolution through tribal court systems, for which they should be commended, I think, not undermined. And again, the Court made that point in Iowa Mutual, recognizing that tribes did not have courts at the time, but that did not deprive them of jurisdiction today. And with respect to the consensual relationship, I point out on page 372 of this Court's decision in Nevada v. Hicks discussing the Montana case, it was referring to private individuals who voluntarily submitted themselves to tribal regulatory jurisdiction by — by arrangements that they or their employers entered into. That precisely describes the situation where you have consent queued, you have a business operating on the reservation pursuant to a tribal license, a tribal lease agreement, and this particular child was working there because of a consensual agreement. And so I could say that person was subject to tribal regulatory jurisdiction, which can be interpreted narrowly to mean the tribe can regulate that person's conduct. If he violates that conduct, the tribe, as a tribe, can fine him. It doesn't necessarily mean that the regulatory jurisdiction includes the — the power to impose tort law and adjudicate tort law. This Court has often said that tort law is a form of regulation, and again, that Iowa Mutual in those cases are premised on the idea that tribal tort law governs and this Court's observation in Nevada v. Hicks about El Paso, that the Navajo tribal law tort claims, the tribal court — there was little doubt that the tribal court had jurisdiction over those claims. Roberts Thank you, counsel. Mr. Goldstein, five minutes remaining. Goldstein, I have three points, and they all happen to relate to questions by Justice Scalia. The first deals with the question of whether tribal tort law, the last point by my friend, is a form of regulation. And we have cases like Regal, we have the preemption context in which the Court has said something like that. But the big difference is that that is about the substance of the tort law, not the forum where it occurs. Imagine a case like Regal. We would say that the application of State tort law was a form of regulation. But if that was heard in a Federal district court on removal, on in diversity jurisdiction, or on a Federal question, it would still be State regulation. So my point here is the most that can establish is that the substance of tort law is regulation, not the forum. We do not agree that that's so, but it would be the only thing that they could get from that argument. What would remain is the difference of adjudication from the substance of the tort law. The second point is, Justice Scalia, I will line up my friend's committee reports against the text of the Constitution. We do not have an answer to the fact that our constitutional tradition has three points in it that are inconsistent with this form of adjudication, and two of them are not specific to the States. The Constitution is the supreme law of the land in the United States. This Court is the supreme court of the United States. That's not true just with respect to the States. That is a bedrock — those are bedrock principles. Neither of them are true here. We also think that our tradition is that you have access to a neutral court. I understand. I accept that Congress implemented that in a removal statute that does not apply here, but my point is that Congress could not have understood that it was a necessary incident of sovereignty when the States were subject to removal jurisdiction at the time the tribes came into the United States. It is historically implausible to believe that in all three of these respects, when the tribes came into the United States, they were in a superior position to the States, and we know that from one other example, and that is also at the time — so these are the Judiciary Acts of 1789 and 90 — Congress made the judgments of State courts enforceable by full faith and credit, but not tribal courts. And it cannot be, then, that it thought the tribal courts were better than the State courts. And it does relate, Mr. Chief Justice, to your point that the Court has never held, despite dictum, that a nonmember is subject to adjudication in a tribal court, because if you haven't done it until now, it is, I think, respectfully implausible to believe that Congress thought it was true in 1880, at a time when the tribes had much less developed legal systems. My final point is — relates to administrability, and you have been offered two alternatives. The other side says we have a test about nexus and foreseeability. I have a standard that says write it down in a contract. My rule is infinitely more administrable, because the other side imagines that people will constantly be running to State and Federal court saying, this nexus wasn't strong enough, I didn't know when I mailed this to the tribe, or this form of tribal tort law is not quite foreseeable enough for me to know what the rule is. That is a bad system. You have said time and again that jurisdictional rules need to be known ahead of time and they need to be clear. And I don't understand the answer to our point that it is disrespectful of the sovereignty that's asserted here. If the tribal supreme court can constantly be overruled by a circuit court in Mississippi, are we seriously treating it as an independent sovereign? That's the question. Sotomayor, let me ask you something. What then remains of the sovereignty of the Indians? They can bring a tort suit against you, the tribes can bring a tort suit against you for dumping on their land, for defacing their archaeological digs. I mean, why is that okay? Okay. Justice Sotomayor, I do not want to give up on our broader argument that Montana's first exception doesn't apply here, but our position is consistent with the fact that this is a question, as my friends have emphasized, of State sovereignty. And when the sovereign brings an action, it is much easier to understand that that is an exercise of self-government and sovereignty than a private tort suit between two people. In addition, we have to be clear that the sovereignty of the Indians is not an independent sovereign. That basically say, in your land, you do what you want. I'm not going to enforce your judgment if I don't think it's consistent with due process here. But we don't dictate to other sovereigns what kind of systems they should have. You're right, we have the power to do that, but it's still something that we don't have to exercise. Justice Sotomayor, because my time has expired, I will be brief. The difference is the dependent sovereignty of the Indian tribes and the fact that individuals have the protections of the Constitution. Thank you. Roberts. Thank you, counsel. The case is submitted.